UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RODNEY IRVIN, | ) | Case No.: 1:06 CV 1779 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| CITY OF SHAKER HEIGHTS, *et al.*, | ) | |
| | ) | |
| Defendants | ) | <u>ORDER</u> |

      The following Motions are currently pending in the above-captioned case between Plaintiff Rodney Irvin ("Plaintiff" or "Irvin") and Defendants City of Shaker Heights ("City Defendant"), Mayor of Shaker Heights Rawson, former Chief of Police Ugrinic, Assistant Chief of Police (now Chief) Lee, and police officers Sgt. Mastnardo, Det. Carlozzi, Ptl. Emlaw, Cpl. Pizon, Sgt. Allison, Ptl. McCandless, and Cpl. Gozelanczyk: (1) Sgt. Mastnardo's Motion for Summary Judgment (ECF No. 47); (2) the other above-named officers' ("Individual Officers") Motion for Summary Judgment (ECF No. 48); and (3) the City of Shaker Heights, the Mayor, Police Chief, and Assistant Police Chief's Motion for Summary Judgment (ECF No. 50).

      For the following reasons, the court hereby grants in part and denies in part Sgt. Mastnardo's Motion for Summary Judgment (ECF No. 47); grants in part and denies in part the Individual Officers' Motion for Summary Judgment (ECF No. 48), and grants in full the City, the Mayor, and the current and former Chiefs of Police's Motion for Summary Judgment (ECF No. 50).

## I.  FACTS AND PROCEDURAL HISTORY

On July 27, 2005, at approximately 10:30 p.m., Plaintiff Rodney Irvin was walking home, pushing his two-year-old daughter in a tricycle, near E. 154th Street and Kinsman Avenue in Cleveland, Ohio.  (Irvin Dep., ECF No. 99-2 at 70.)  Irvin saw his former brother-in law, Bob Nance ("Nance"), in a passing vehicle and began a conversation.  (*Id*. at 71.)  Nance handed Irvin his business card.  (*Id*. at 76.)  Aware of the police car behind Nance, Irvin suggested that he pull off the main street and onto 154th Street; Nance did so and the two resumed their conversation.  (*Id*. at 76.)  Defendant Mastnardo, a corporal at the time, was driving that police car accompanied by his canine partner.  (Mastnardo Dep., ECF No. 97-2 at 53.)  He turned as well and drove past Irvin and Nance, and then made a U-turn.  (*Id.*)  He maintains that as he approached, he saw a hand-to-hand transaction between the two men.  (*Id.* at 57-58.)  According to Mastnardo, he believed Nance and Irvin were engaged in a drug transaction.  (*Id*. at 64.)  He parked on the other side of 154th, told the dispatcher he was making a traffic stop, and got out of his car. (*Id*. at 59, 68.)

Accounts differ as to whether Mastnardo took his gun from its holster and released his dog on initially leaving the car.  Irvin maintains that Mastnardo approached Nance's car initially with his gun drawn and that the dog left the police car at the same time.  (Irvin Dep., ECF No. 99-2 at 84, 97.)  Nance stated right after the incident that the gun was not initially drawn, but at Irvin's criminal trial he testified that the gun was out as Mastnardo crossed 154th Street from his patrol car.  (Nance Statement, ECF No. 97-14 at 5; Nance Testimony, ECF No. 97-6 at 423.)  Mastnardo maintains, however, that he did not draw his gun until he reached the front of Nance's car, just a few feet from Irvin, after he determined that Irvin was not complying with his instructions and might pose a threat. (Mastnardo Dep., ECF No. 97-2  at 70, 72.)  He states that he released the dog from his vehicle by

-2-

remote control later in the interaction.  (*Id.* at 90.)  Mastnardo told Nance to place his hands on the

steering wheel, and Nance complied.  (*Id.* at 70; Nance Testimony, ECF No. 97-6 at 366.)

   The specifics of the interaction between Mastnardo and Irvin are also in dispute.  Irvin says

he forcefully questioned Cpl. Mastnardo's actions in pulling his weapon and allowing his police dog

twice to approach Irvin's daughter.  (Irvin Dep., ECF No. 99-2 at 86, 92-93, 98.)  Irvin alleges, with

support from Nance's testimony, that Mastnardo told him he was under arrest before there was any

physical contact.  (*Id.* at 101; Nance Testimony, ECF No. 97-6 at 371.)  Mastnardo maintains, with

support from Nance's testimony, that Irvin was uncooperative and argumentative.  (Mastnardo Dep.,

ECF No. 97-2 at 71-72; Nance Testimony, ECF No. 97-6 at 370.)  The parties disagree about

whether Irvin's hand was in his pocket at any point.  (Irvin Dep., ECF No. 99-2 at 102; Mastnardo

Dep., ECF No. 97-2 at 76.)

   A physical altercation ensued.  Mastnardo asserts that he sharply pushed Irvin in the chest

in order to secure Irvin's cooperation in removing his hand from his pocket as instructed.

(Mastnardo Dep., ECF No. 97-2 at 84.)  He says that Irvin then struck him in the shoulder and neck

area.  (*Id*. at 86-88.)  Mastnardo says he disengaged to call for faster backup, reholstered his weapon,

and only then summoned his police dog for assistance.  (*Id*. at 89-90.)  According to Mastnardo,

Irvin then pushed the tricycle into him, tried to punch him, and the two men grappled as the tricycle,

with Irvin's daughter strapped into it, fell to the side.  (*Id*. at 102-106.)  Mastnardo asserts that the

dog bit Irvin in accordance with its training, in order to protect the officer, and that Irvin repeatedly

beat the dog's head against the ground, causing a broken tooth and other injury.  (*Id*. at 108, 128;

*see* Aff. of Dr. Richard Thompson, ECF No. 47-5.)  Mastnardo asserts that the several efforts to

subdue Irvin, using precisely aimed strikes to the body and a sleeper hold, had only marginal success.  (Mastnardo Dep., ECF No. 97-2 at 109-120.)

Irvin alleges that Mastnardo hit him in the chest, that the two men never "tussled," and that he never struck Mastnardo.  (Irvin Dep., ECF No. 99-2  at 113.)  Irvin states that he was attacked and bitten by the police dog.  (*Id.* at 104-07.)  Irvin describes a tug-of-war with the dog as he tried to prevent the dog from biting him, and he maintains that Mastnardo struck him in the head from behind, knocking him on top of the dog.  (*Id.* at 105.)  Irvin states that he was never put in a sleeper hold.  (*Id.* at 134.)

Irvin alleges that several other officers, beginning with Defendants Emlaw and Pizon, arrived at the scene and began "hitting, kicking, and stomping him." (Irvin Dep., ECF No. 99-2 at 121; Compl., ECF No.1 at ¶ 29.)  He remembers being assaulted by Det. Carlozzi, who also allegedly dismissed his expression of concern about his daughter with the words "fuck her."  (*Id.* at 124.)  He remembers Sgt. Allison being at the scene but alleges no specific actions by him.  (*Id.* at 134-35.)  He is not certain but believes Ptl. McCandless and Cpl. Gozelanczyk were involved in the alleged beating as well.  (*Id.* at 157.)  Irvin acknowledges that he continued to struggle with all the officers while attempting to reach his daughter.  (*Id.* at 124-25, 157.)

All the backup officers describe an intense struggle to subdue Irvin.  (Ind. Def. Affs., ECF Nos. 48-2 through 48-7.)  Cpl. Gozelanczyk says that he was the first one to arrive and that at that point Irvin was still on his feet struggling with Mastnardo.  (Gozelanczyk Aff., ECF No. 48-6 at ¶ 8.)  Sgt. Allison says he joined Gozelanczyk and Cpl. Pizon in grappling with Irvin.  (Allison Aff., ECF No. 48-5 at ¶ 10.)  Ptl. McCandless avers that he did not have contact with Plaintiff and instead tended to Irvin's daughter in the tricycle.  (McCandless Aff., ECF No. 48-3 at ¶¶ 11, 13.)  Ptl.

Emlaw also avers that he had no contact with Plaintiff and was tasked with searching Nance's vehicle.  (Emlaw Aff., ECF No. 48-7 at ¶¶ 11, 15.)

Irvin states that after being arrested, he asked for medical help for his bite wounds and bruises on several occasions over the next few days, but received no real attention, except some aspirin, until several days later at the county jail.  (Irvin Dep., ECF No. 99-2 at 163.)  In contrast, Gozelanczyk avers that he asked Irvin if he needed medical assistance, but Irvin declined. (Gozelanczyk Aff., ECF No. 48-6 at ¶ 13.)  The county doctor, a week later, told Irvin that since the wounds were not infected, they would heal without incident.  (Irvin Dep., ECF No. 99-2 at 163.) Irvin maintains that the bite wound in his chest became a keloid and still itches on occasion.  (*Id.* at 161-62.)  Mastnardo, meanwhile, had injuries after the struggle that led to his not being cleared to return to full duty until early February 2006.  (Mastnardo Dep., ECF No. 97-2 at 23.)

Irvin was charged with felonious assault on a police officer, assault on a police dog, and child endangerment.  His Indictment was later amended to include two additional felonies.  (Compl., ECF No. 1 at ¶ 37.)  He was unable to post bond and was imprisoned from July 2005 until February 2006.  On February 6, 2006, a jury found Irvin not guilty on all felony charges; after a nolo contendere plea, he was found guilty of a misdemeanor count of child endangerment.  (Journal Entry, ECF No. 48-8.)

One piece of evidence available for the criminal trial was a compact disc containing surveillance footage from the front of a public works building in Shaker Heights.  (Evidentiary Hearing Trans., ECF No. 97-11 at 44-45.)  Officers say it showed Irving, Nance, and Mastnardo approaching the scene of the incident but, because of its orientation, could not have captured any of the actual encounter.  (*Id.* at 10-11, 73).  Testimony and physical evidence about the orientation

-5-

of the camera and the location of the incident corroborate this assertion.  (*Id*. at 17-21.)  Sometime

between Irvin's trial and discovery in this action, the CD disappeared from the case file and could

not be located.  (*Id*. at 80.)  After a hearing on March 16, 2011, the court determined that its

disappearance does not harm Plaintiff's case and declined to issue sanctions against Defendants.

(Order Denying Pl. Mot. for Sanctions, ECF No. 84.)

 An anonymous letter making reference to the video footage was received in the Shaker

Heights Law Department at some point during the pendency of this case.  (Cannon Dep., ECF No.

98-4 at 16; Anonymous Letter, ECF No. 98-6.)  Purporting to be from a member of the Police

Department, the letter charged that the footage contradicted some of Mastnardo's testimony and was

being covered up.  (*Id*.)  The Chief and Assistant Chief met with officers and asked them to review

the case and report back any concern, but there was no direct investigation of the letter's charges.

(Lee Dep., ECF No. at 11, 16.)  According to one of the officers present, Chief Ugrinic said in the

meeting that he was "not going to get into the habit of investigating rumor and innuendo."  (Marvin

Lamielle Dep., ECF No. 98-3 at 47, 52.)

 As a result of the events leading up to his arrest and jury trial, Plaintiff filed a Complaint in

this court on July 24, 2006.  (ECF No. 1.)  Irvin claims that Defendants violated his Fourth, Fifth,

Eighth, and Fourteenth Amendment rights.  He brings his claims pursuant to 42 U.S.C. §§ 1983,

1985, and 1988, and under state law.  (Compl., ECF No. 1 at ¶¶ 2, 44, 65, 83.)

 Count I of Plaintiff's Complaint is for "Wrongful Search and Seizure; Excessive Use of

Force in violation of rights and privileges secured by 4th and 14th Amendments and 42 USCA Sec.

1983."  (*Id*. at 9.)  Count II is for "8th Amendment Violation: Refusal of Medical Treatment."  (*Id*.

at 10.)  Count III is for "Assault and Battery [a]nd Intentional Infliction of Emotional Distress."  (*Id*.

at 11.)  Count IV is for "False Arrest."  (*Id.* at 12.)  Count V is entitled, "Probable Cause," and claims that "Defendants lacked probable cause in which to make an arrest of his person because they had no basis for concluding he had or was committing a crime."  (*Id.* at 13.)  Count VI is for "Malicious Criminal Prosecution."  (*Id.*)  Count VII is for "Conspiracy."  (*Id.* at 14.)  Count Eight is for "Negligent Supervision" and claims that the City of Shaker Heights "failed or neglected to supervise, direct or control officers in the commission of the unlawful conduct against the Plaintiff." (*Id.*)  Count IX is for "Punitive Damages."  (*Id.* at 15.)

## II.  LEGAL STANDARD

### A.  Summary Judgment

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and provides:

> A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. . . .

A party asserting there is no genuine dispute as to any material fact or that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most cases the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999). The moving party has the burden of production to make a prima facie showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the burden of persuasion at trial would be on the non-moving party, then the moving party can meet its burden of production by either: (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim"; or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*.

If the moving party meets its burden of production, then the non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Id*. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

-8-

**B.  Qualified Immunity**

Section 1983 permits actions seeking damages for constitutional violations committed by persons acting under color of state law.  42 U.S.C. § 1983.  Qualified immunity protects an official from liability if the official's conduct does not violate "clearly established" statutory or constitutional rights that a reasonable person would have known were in existence.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Supreme Court has stressed  that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  This does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."  *Id*. (citing *Mitchell v. Forsyth*, 472 U.S. 511, 535 (1985)).  Rather, it means that, "in light of pre-existing law the unlawfulness must be apparent."  *Anderson*, 483 U.S. at 640.  *E.g.*, *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986); *Mitchell*, 472 U.S. at 528; *Davis v. Scherer*, 468 U.S.183 (1984).

A defendant bears the initial burden of putting forth facts that suggest that he was acting within the scope of his discretionary authority.  *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992).  However, the plaintiff bears the ultimate burden of proof to show that the defendants are not entitled to qualified immunity.  *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir.1991).  "[T]he burden is on the plaintiff to allege and prove that the defendant violated a clearly established constitutional right."  *Spurlock v. Satterfield,* 167 F.3d 995, 1005 (6th Cir. 1999).

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court held that, in addressing the issue of qualified immunity, a court must first determine whether there is a violation of a constitutional right before addressing the issue of whether the right was clearly established.  While

-9-

this approach may be appropriate in many cases, it is no longer mandatory.  The Supreme Court

modified this approach in *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  District and circuit court

judges are allowed the freedom to determine which prong of the immunity analysis to address first.

*Id.* at 821; *see also Waters v. City of Morristown*, 242 F.3d 353, 360 (6th Cir. 2001) (A plaintiff

must: (1) identify a violation of a clearly established constitutional right; and (2) show that the

officer acted in an objectively unreasonable manner.).  It should also be noted that some panels of

the Sixth Circuit have applied a third step, involving the sufficiency of the evidence.  *Grawey v.*

*Drury*, 567 F.3d 302, 309 (6th Cir. 2009).  This step requires "the court to determine whether the

plaintiff has offered sufficient evidence to indicate that what the official allegedly did was

objectively unreasonable in light of the clearly established right."  *Id.*

### III.  LAW AND ANALYSIS

#### A.  Seizure and Excessive Force: Sergeant Mastnardo

##### 1.  *Terry* Stop

###### a.  Constitutional Violation

Defendant Mastnardo argues that his initial seizure of Irvin and Nance for questioning was

justified pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).  (Def. Mastnardo's Br. in Supp. of Summ. J.,

ECF No. 47-1, at 9-10; *see also* Aff. of Trooper Shaun Smart, ECF No. 47-4 at 7.)   A stop of a

citizen for investigative purposes, based on a reasonable suspicion of criminal activity, may include

a search for weapons to help ensure the safety of the investigating officer "regardless of whether he

has probable cause to arrest the individual."  *Terry*, 392 U.S. at 27.  Such a search may, in turn, lead

to evidence that gives an officer probable cause to make an arrest.  *See, e.g.*, *id.* at 7.

To evaluate a "*Terry* stop," the court considers whether the officer had a reasonable suspicion of criminal activity and whether he or she conducted the seizure with a reasonable degree of intrusion. *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). The "reasonable suspicion" standard draws on the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). To make the latter judgment, the court evaluates "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir. 1986) (citing *Terry*, 392 U.S. at 19-20).

Mastnardo argues that several factors made him suspect that Plaintiff and Nance were engaging in a drug transaction, including the roadside conversation on a thoroughfare, the high-crime nature of the neighborhood, the fact that Irvin was wearing a jacket on a summer evening, and the lateness of the hour for walking a small child outdoors. (Def. Mastnardo's Br. in Supp. of Summ. J., ECF No. 47-1 at 10-11; *see also* Smart Aff., ECF No. 47-4 at 7-8.) Mastnardo's expert avers that it was reasonable for Mastnardo to take precautions, since drug dealers are often armed. (Smart Aff., ECF No. 47-4 at 4.)

Whether or not the incident occurred in a high-crime area is disputed. Defendant relies on the Director of the Statistical Analysis Center of the Ohio Department of Public Safety, Office of Criminal Justice Services, Lisa Shoaf, produced a report showing incidents that have occurred in zip code 44120 (Aff. of Lisa Shoaf, ECF No. 47-2.). She does not provide analysis of this report. Plaintiff attached an unexecuted affidavit from Lisa Shoaf, to which she included a report of criminal

activity in zip code 44122.  (unexecuted Aff. of Lisa Shoaf, April 2009, ECF No. 97-13.)  As this

affidavit is unexecuted, it can not be considered as evidence. Fed. R. Civ. P. 56(c)(4).

Mastnardo averred that where Plaintiff and Nance stopped was "in a known, high drug

trafficking area."  (Mastnardo Aff., ECF No. 47-3, ¶ 35(4).)  Mastnardo also averred that

"[s]ignificant drug activity takes place in the area where the hand-to-hand transaction occurred.  In

fact, it is one of the most notorious drug trafficking areas in the greater Cleveland area." (*Id.* at ¶14.)

Whether an area is considered to be high-crime is "relevant to the reasonable suspicion calculus."

*United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006); *see also United States v. Martin*, 289

F.3d 392, 397 (6th Cir. 2002) ("The fact that a given locale is well known for criminal activity will

not by itself justify a *Terry* stop; but it is among the various factors that officers may take into

account."); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) ("An individual's presence in a 'high

crime area,' standing alone, is not enough to support a reasonable, particularized suspicion of

criminal activity, but a location's characteristics are relevant in determining whether the

circumstances are sufficiently suspicious to warrant further investigation.").  However, the

*Caruthers* Court acknowledged the "dangers of relying too easily or too heavily on these contextual

factors" and explained that "'[t]he citing of an area as 'high-crime' requires careful examination by

the court, because such a description, unless properly limited and factually based, can easily serve

as a proxy for race or ethnicity.'") *Caruthers*, 458 F.3d at 467   (quoting *United States v.

Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc)).

Plaintiff admits that he was pushing his daughter in a tricycle that night.  He also admits that

he was wearing a jacket.  Plaintiff maintains that his only physical contact with Nance was taking

his business card from him, when the car was still on Kinsman directly in front of Mastnardo's

-12-

police car.[1] (Irvin Dep. at 76.)  Taking Plaintiff's version of the facts as true, the question is whether the totality of the circumstances gave Mastnardo reasonable suspicion to conduct a *Terry* stop.

When a police officer witnesses a hand-to-hand exchange in an area known for drug transactions, the officer has reasonable suspicion to believe that criminal activity is afoot.  *United States v. Sweeney*, 402 F. App'x 37 (6th Cir. 2007) (The officers observed a group of men, one of whom was holding money and another plastic bags, at an intersection known for drug activity.  The Court determined that the officers had reasonable suspicion to stop one of the men driving away from the group in a minivan.); *see also United States v. Hood*, Nos. 92-5112 & 92-5113, 1992 WL 322373, at *3 (6th Cir. Nov. 5, 1992) (Officers observed an exchange with individuals in an area known for drug trafficking, and the Court determined that this gave them reasonable suspicion to conduct a *Terry* stop.).

Given that Mastnardo saw Nance hand something to Irvin late at night in an area known for drug transactions, this court finds that Mastnardo had reasonable suspicion to conduct a *Terry* stop.

### b.  Clearly Established

As the court has found that no constitutional violation occurred, it need not determine whether Plaintiff's right was clearly established.  Mastnardo is entitled to qualified immunity for making the initial *Terry* stop.

---

[1]      Mastnardo gives conflicting testimony about when, or if, he saw a hand-to-hand transaction.  However, for the purposes of a qualified immunity analysis, the court credit's Plaintiff's version of the facts as true.

-13-

## 2.  Arrest

### a.  Constitutional Violation

Mastnardo does not argue that he had probable cause to make an arrest and instead pursues the argument that under *Terry*, he could use force to "dislodge the [P]laintiff's concealed hand." (Def. Mastnardo's Br. in Supp. of Summ. J., ECF No. 47-1, at 17.)  Plaintiff argues, in support of his wrongful seizure claim, that an investigatory stop can ripen into an arrest, at which point an officer needs probable cause to justify the arrest.

The Court in *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir.1994) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984)), explained that during an investigatory stop,

> "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released."

According to Irvin's account, what began as a *Terry* stop ripened into an arrest almost immediately.  Irvin has testified that he was told he was under arrest very early in the encounter, while he was arguing with Mastnardo about the officer's initial menacing conduct.  (Irvin Dep. at 101; *see also* Nance Testimony at 371 (asserting that Irvin was "mouthing off" and Mastnardo responded by saying, "you're going to jail").)  As Mastnardo has not presented evidence that he had probable cause to arrest Plaintiff, he is not entitled to qualified immunity for the arrest.[2]

---

[2]     In addition to alleging a wrongful search and seizure in Count I of his Complaint, Plaintiff alleges that "Defendants lacked probable cause in which to make an arrest of his person" in Count V and entitles that Count as "Probable Cause.  The court interprets the claim to really be one of unlawful seizure, which requires the court to undertake an analysis of whether probable cause existed.  Thus, Count V is dismissed, but Count I remains.

## b.  Clearly Established Right

It is clearly-established that an officer cannot arrest a person without probable cause. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999) ("[A]bsent probable cause to believe that an offense had been committed, was being committed, or was about to be committed, officers may not arrest an individual.").  Therefore, Mastnardo's Motion for Summary Judgment on Plaintiff's wrongful seizure claim is denied.

## 3.  Excessive Force

### a.  Constitutional Violation

The Supreme Court has held that force used in making seizures must be "objectively reasonable in light of the facts and circumstances confronting" the officer.  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  The Court has cautioned that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id*.  Even when an arrestee is resistant, he has a constitutional right to police conduct that does not "cross the line from subduing an individual to assaulting him."  *Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008).  Factors to be considered when determining whether use of force was unreasonable include: "(1) the severity of the crime at issue, (2) the immediacy of the threat posed by the suspect to the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight."  *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 486 (6th Cir. 2007) (internal citation omitted).

The physical altercation began when Mastnardo pushed Irvin in the chest.  (Irvin Dep. at 103 ("[I]t was like a punch, a punch with a push behind it."); Mastnardo Dep. at 84 ("I push[ed] him in an attempt to remove his right hand from his pocket."); *see also* Nance Testimony at 371 (After

-15-

telling Irvin he was going to jail, Mastnardo "walked up to him and grabbed him . . . toward the chest area.".)  Irvin denies retaliating and says that a moment later, as he was recovering his balance, he was attacked by the police dog and bitten in the chest and thigh.  (Irvin Dep., ECF No. 99-2 at 104, 107-110.)  He says he fought with the dog to defend himself, and Mastnardo did not call off the dog's attack until the arrival of the other officers.  (*Id.* at 114.)

According to Plaintiff, the force used included Mastnardo punching and kneeing Plaintiff, Mastnardo's police dog biting Irvin, and Mastnardo hitting Plaintiff in the head with a hard object. The use of police dogs can be excessive force.  *White v. Harmon*, No. 94-1456, 1995 WL 518865, at *3 (6th Cir. Aug. 31, 1995) (A canine handler was not entitled to qualified immunity for bringing a little-trained dog to an arrest scene where the plaintiff had already been handcuffed and for failing to prevent the dog from biting the plaintiff.); *see also McGovern v. Vill. of Oak Law*, 2003 WL 139506, at *7 (N.D. Ill. Jan. 17, 2003) (denying summary judgment on the plaintiff's excessive force claim where the plaintiff was hiding under a trailer, attempted to surrender, and then was bitten by a police dog); *Vathekan v. Prince George's County*, 154 F.3d 173, 178 (4th Cir. 1998) ("An attack by an unreasonably deployed police dog in the course of a seizure is a Fourth Amendment excessive force violation."); *cf. Matthews v. Jones*, 35 F.3d 1046, 1051-52 (6th Cir. 1994) (holding police dog attack not excessive force where plaintiff ignored several warnings and presented a threat) . Moreover, Irvin alleges that Mastnardo struck him on the head with a hard object, which in itself can constitute excessive force in the Sixth Circuit.  *See Davis v. Bergeon*, No. 98-3812, 1999 WL 591448, at *4 (6th Cir. July 27, 1999) (reversing grant of summary judgment where the plaintiff ignored police instructions and was struck in the head with an asp baton).

-16-

Under Irvin's account of the facts, therefore, the court finds that the level of force Mastnardo used in securing the arrest amounted to a constitutional violation. The suspected crime of drug activity was not an intrinsically violent one. Irvin was not an immediate threat with his hands visible and his daughter in front of him. Although he was argumentative, he was not actively resisting or evading arrest. Therefore, under *Smoak*, Mastnardo's use of force was not justified by the situation.

### 4. Clearly Established

In cases involving unleashed police dogs, the Sixth Circuit maintains a bright-line rule that an attack by a dog must be preceded by a warning:

> It was clearly established [by the spring of 2002] that police officers violate the Fourth Amendment's protection against excessive force when they dispatch a police dog to find and seize a criminal suspect without first giving a clear warning such force will be used if the suspect does not surrender.

*Baker v. Snyder*, No. 1:03-CV-89, 2004 U.S. Dist. LEXIS 30056, at *27 (E.D. Tenn. May 11, 2004); citing *Matthews v. Jones*, 35 F.3d 1046, 1050 (6th Cir. 1994) and *Robinette v. Barnes*, 854 F.2d 909, 911 (6th Cir. 1988); *see also Vathekan*, 154 F.3d at 179 ("Fourth Circuit precedent existing in 1995 clearly established that failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context") (citing *Kopf v. Wing*, 942 F.2d 265, 268 (4th Cir.1991)). Here, Irvin avers that he was not refusing to surrender and that he received no warning of the dog's impending attack. (Irvin Decl., ECF No. 97-1 at ¶ 33.) His right in those circumstances to be free of the alleged level of force was clearly established. Moreover, the proscription against gratuitous blows to the head is well established in the Sixth Circuit. *See Dugan v. Brooks*, 818 F.2d 513, 517 (6th Cir. 1987). Qualified immunity on the claim for excessive force is therefore denied.

In summary, the court holds that Mastnardo is immune from suit on the issue of his initial basis for an investigative stop of Plaintiff.  Qualified immunity is denied, however, on Plaintiff's claims that his arrest was illegal and that he was subjected to excessive force.

### B.  Seizure and Excessive Force: Other Officers

#### 1.  Basis for Arrest

##### a.  Constitutional Violation

Individual Officers argue that they had "reasonable suspicion - if not outright probable cause - to detain" Plaintiff because "[w]hen they arrived at the scene, the Backup Officers witnessed the plaintiff resisting arrest."  (Individual Officers' Br. in Supp. of Summ. J., ECF No. 48-1, at p. 11.)  Mastnardo radioed for other officers to join him at the scene of Irvin's arrest.  In a subsequent transmission, he radioed for the other officers to "step it up," indicating a need for emergency assistance.  (Mastnardo Dep., ECF No. 97-2 at 114; McCandless Aff., ECF No. 48-3 at ¶ 8.)  As a result, certain Defendant Officers arrived on the scene to help defend Mastnardo and saw him struggling with Irvin.  (*See e.g.*, Gozelanczyk Aff., ECF No. 48-6 at ¶ 8.)

The backup officers were not required to inquire into the origins of the situation in order to determine whether Irvin was resisting an illegitimate arrest.  *See United States v. Hensley*, 469 U.S. 221, 231 (1985) (explaining that "officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers") (quoting *United States v. Robinson*, 536 F.2d 1298, 1300 (9th Cir. 1976)).

According to Irvin's version of events, there was no basis for the other officers to know that the arrest was illegitimate or that Irvin had presented no danger to Mastnardo.  Therefore, summary

judgment is appropriate for the backup officers on this issue, because their choice to arrest Plaintiff was not a violation of his rights.

### b.  Clearly Established Constitutional Right

Since the court has found that the backup officers had probable cause to arrest Plaintiff, the court need not evaluate whether Plaintiff's right was clearly established.

### 2. Method of Arrest and Excessive Force

### a.  Individual Defendants at Issue

Plaintiff's testimony about the alleged beating includes acknowledgments that he may have confused some officers with others.  (*See* Irvin Dep., ECF No. 99-2 at 121, 126, 155 ("When I was on the ground, like I said, I could see various ones, but by me moving my head and really couldn't tell."); *see also id*. at 132-33 ("Some of 'em was whooping me and some of 'em was standing."); Individual Officers' Reply, ECF No. 100 at 2.)  Somtimes Irvin's testimony is specific.  He maintains that Officer Emlaw physically harmed him during the arrest.  (Irvin Depo., ECF No. 99-2 at 115-19, 121-22.)  He includes a specific description of the white and orange jersey Carlozzi wore during the incident.  (*Id*. at 123-25.)  Irivn also testified that Officer Pizon kicked and kneed him.  (*Id*. at 121-22.)  In his Opposition Brief, Irvin does not point to evidence in the record explaining what Officers Allison, Gozelanczyk, and McCandless did.  However, Irvin does refer to the officers in general and stated that they beat and kicked him.  (*Id*. at 125-26.)  Furthermore, Officers Allison and Gozelanczyk aver that they helped to subdue Irvin.  (Gozelanczyk Aff., ECF No. 48-6 at ¶¶ 9-10; Allison Aff., ECF No. 48-5 at ¶10.)

-19-

While Irvin's testimony is tentative and somewhat uncertain as to some of the Individual Officers, nevertheless he testified that all of the Individual Officers were involved with restraining him.

### b. Constitutional Violation

Individual Officers argue that they did not use excessive force because it was appropriate to subdue Plaintiff when they observed Plaintiff "engaged with Sgt. Mastnardo and/or the police dog." (Individual Officers' Br. in Supp. of Summ. J., ECF No. 48-1 at 13.)

Irvin maintains that all his struggles were nonaggressive attempts to resist being handcuffed and to reach his daughter. (Irvin Dep., ECF No. 99-2 at 124-125, 157.) He describes continued stomping and beating by the police even though the "only thing that was waving around was my mouth and my arm." (*Id*. at 127.) He states that afterward his head was ringing and he had stiffness in his neck, arm, and rotator cuff. (*Id*. at 145.) Construing these allegations in the light most favorable to Plaintiff, they suggest that although he was not yet handcuffed, he presented no threat. While some efforts to immobilize him would then be appropriate, beating and kicking would not be. *See Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) (When the plaintiff had his hands up in a "surrender" position and an officer struck the plaintiff in the head and the knee, the officer was not entitled to qualified immunity.); *see also Tapp v. Banks*, 1 F. App'x 344, 350 (6th Cir. 2001) ("[I]t is not objectively reasonable for an officer dealing with an essentially compliant person, to strike the person's legs twelve to fifteen times in the absence of resistance."); *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 687-88 (6th Cir. 2006) (An officer was not entitled to summary judgment when he struck the plaintiff in the eye with a stick and jumped up and down on the plaintiff's back and struck the plaintiff's neck and shoulders while the plaintiff was laying down and

-20-

incapacitated from pepper spray.). The court therefore finds that Irvin's account supports a finding that certain Defendant Officers of the City committed a constitutional violation by using excessive force during the arrest.

### c. Clearly Established Right

As discussed above, the principle of force proportionate to necessity is well established in the Sixth Circuit. *See Shreve*, 453 F.3d at 688 ("Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest."). The court therefore finds that qualified immunity is not appropriate because Irvin's account supports a finding that the backup officers violated a clearly established constitutional right to be free from gratuitous beating when arrested. As a result, Individual Defendants Emlaw, McCandless, Pizon, Allison, Gozelanczyk, and Carlozzi are not entitled to qualified immunity on the issue of excessive force.

### C. Refusal to Provide Medical Treatment

### 1. Constitutional Violation

The Complaint charges that Individual Defendants violated Irvin's Eighth Amendment rights by withholding needed medical care. (Compl., ECF No. 1 at ¶ 55.) However, it is the Fourteenth Amendment guarantee of the right to due process that requires the state "to provide medical care to persons who have been injured while being apprehended by the police." *City of Revere v. Mass. Gen'l Hosp.*, 463 U.S. 239, 244 (1983). The Sixth Circuit has held that "[t]o sustain a cause of action under § 1983 for failure to provide medical treatment, [a] plaintiff must establish that the defendants acted with 'deliberate indifference to serious medical needs.'" *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This is in part

a subjective standard, requiring that a plaintiff show that officers not only had reason to know but actually knew that the plaintiff had serious medical needs. *Id.* The deliberate-indifference test also sets a high objective standard, as the plaintiff must undergo "conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). Even a risk of such harm violates the Constitution. The Sixth Circuit has held that "it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004).

Mastnardo and the Individual Defendants argue that Plaintiff only sustained minor injuries. Irvin and Mastnardo agree that Mastnardo suggested to paramedics on the scene of the arrest that Irvin be examined. (Mastnardo Aff., ECF No. 47-3 at ¶¶ 29, 39; Irvin Dep., ECF No. 99-2 at 137.) However, Irvin maintains that the paramedics did not attend to him. (Irvin Dep., ECF No. 99-2 at 154.) In contrast, Gozelanczyk avers that Irvin declined an offer of medical attention that night. (Gozelanczyk Aff., ECF No. 48-6 at ¶ 13.) Irvin says his injuries were photographed the night of the arrest and that on several occasions over the following days he asked for medical help because of the dog bites and head pain. (Irvin Dep., ECF No. 99-2 at 159-164.) Nonetheless, he was not seen by a doctor until after arriving at the county jail six days later. (*Id.*) At that point, the doctor did not think the uninfected wounds were serious, and, on learning they were a week old, laughed at Irvin's concern. (*Id.*) This evidence provides only weak support for an objective finding of "substantial risk of serious harm" from the wounds going untreated.

Neither the Complaint nor Plaintiff's Deposition specify which individuals are accused of manifesting deliberate indifference. Mastnardo did not take Irvin into custody, and before leaving

-22-

the scene he suggested that paramedics examine him.  As to the officers in the station, Irvin has not presented evidence that they knew of his bite wounds to the chest and thigh.  He names only one officer who knew the extent of Irvin's wounds at a time when treatment was appropriate, an officer named Westfall, at the Shaker police station.  Irvin says that when he asked Westfall "could I see a doctor or a nurse, he stated to me they won't be nobody here probably until Thursday or Friday." (Irvin Dep., ECF No. 99-2 at 160.)  Irvin has not named Officer Westfall in this action and has presented no evidence in support of the claim that any other individual acted with deliberate indifference.  (*See id.* at 130.)  Cpl. Gozelanczyk volunteers that he saw and photographed the wounds and avers that he believed them to be minor.  (Gozelanczyk Aff., ECF No. 48-6 at ¶¶ 13, 18.) Irvin does not put forth any evidence that Gozelanczyk did not believe this or that he acted with deliberate indifference.  Accordingly, summary judgment is granted to all Individual Defendants on the charge of refusal to provide medical treatment.

### 2.  Clearly Established Constitutional Right

Since the court has found that there was no violation of Plaintiff's constitutional right, no further analysis is necessary.

### D.  Malicious Prosecution

Plaintiff contends that Individual Defendant police officers violated his constitutional rights by maliciously prosecuting him for felonious assault on a police officer, assault on a police dog, and child endangerment.  (Compl., ECF No. 1 at ¶¶ 76-80.)  Plaintiff brings the claim of malicious prosecution without specifying whether he is doing so under federal or state law.  Both federal and Ohio law recognize malicious prosecution as a cognizable tort. *Criss v. Springfield Twp.*, 564 N.E.2d 440 (Ohio 1990); *Trussell v. Gen. Motors Corp.,* 559 N.E.2d 732 (Ohio 1990).  The elements of

-23-

malicious prosecution in Ohio are: "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Criss*, 564 N.E.2d at 443.  Malicious prosecution is also a recognized federal claim.  *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003).  To establish the federal claim, the plaintiff must show that (1) the defendant officer influenced or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty due to the prosecution; and (4) the proceeding was resolved in the plaintiff's favor.  *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010).

Defendant Mastnardo argues that he "is entitled to summary judgment because the plaintiff's allegations amount to mere speculation and conjecture, unsupported by the factual record.  Such allegations are insufficient to defeat a motion for summary judgment."  (Mastnardo's Br. in Supp. of Summ. J., ECF No. 47-1, at 18-19.)  Individual Defendants interpret the malicious prosecution claim to be based in state law and maintain that "the plaintiff in this matter cannot present any evidence that would satisfy the high standard necessary to demonstrate malice, wanton misconduct, or bad faith.  That the plaintiff may make bald allegations, unsubstantiated by the factual record, is inconsequential.  Mere allegations are insufficient to overcome summary judgment in this instance." (Individual Officers' Br. in Supp. of Summ. J., ECF No. 48-1 at 17.)

Plaintiff provides no evidence in support of his malicious prosecution claim in his Briefs in Opposition.  As stated above, one way a defendant can succeed on summary judgment is by demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."  *Celotex*, 477 U.S. at 331.  However, even where a summary judgment motion is uncontested, as in this case, a court is not permitted to merely enter

-24-

judgment in the moving party's favor.  *Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir. 1998) ("[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded.")  Instead, the court may grant summary judgment only if after a close examination of the Motion and the documents in support, the court determines that no genuine issue of material fact remains.  *Id.*; *Turner v. FMC*, 23 F. App'x 415, 417 (6th Cir. 2001).

The law on malicious prosecution is that a grand-jury indictment creates a presumption of probable cause.  *Harris*, 422 F.3d at 327.  A plaintiff can overcome this presumption only if he presents evidence that the officer "(1) stated a deliberate falsehood or showed reckless disregard for the truth [at the hearing] and (2) that the allegedly false or omitted information was material to the [court's] finding of probable cause."  *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006).  Ohio law is substantially the same: "a grand jury indictment in the criminal prosecution creates a rebuttable presumption that defendants had probable cause to prosecute, unless the plaintiff shows those proceedings received perjured testimony or were otherwise significantly irregular."  *Mayes v. City of Columbus*, 664 N.E.2d 1340, 1346 (Ohio App. 10 Dist. 1995) (citation omitted).

Therefore, Mastnardo and the Individual Defendants argued that Plaintiff would not be able to put forth evidence of malicious prosecution, and indeed, Plaintiff did not do so in his Opposition Briefs.  As a result, summary judgment on the malicious prosecution claim is hereby granted in favor of Mastnardo and the Individual Defendants.

### E. Conspiracy

The Complaint alleges that all Individual Defendants participated in a conspiracy to violate his constitutional rights, as prohibited by 42. U.S.C. § 1983 and 42 U.S.C. § 1985(2).  (Compl., ECF No. 1 at ¶ 83.)

-25-

### 1. Conspiracy Pursuant to 1983

Defendants argue that Plaintiff cannot put forth any facts that support his contention that Defendants engaged in a conspiracy in violation of § 1983.  (Def. Mastnardo's Br. in Supp. of Summ. J., ECF No. 47-1 at 20 ("To the extent the plaintiff makes allegations of a conspiracy, those allegations are vague and conclusory and utterly without factual support.")).  Mastnardo argues that "[P]laintiff simply fails to offer any evidence of a conspiratorial agreement or plan.  To the extent the plaintiff makes allegations of a conspiracy, those allegations are vague and conclusory and utterly without factual support."  (*Id.*)  When Irvin was asked why he thinks the police engaged in a conspiracy, he answered: "I don't know why they lied about the whole thing.  You know, I just assume and speculated that they did it because of Mastnardo trying to become sergeant and I, I can only speculate and assume, like they did."  (Irvin Dep., ECF No. 99-2 at 208.)  The Individual Defendants incorporate Mastnardo's arguments as their own.

In response, Plaintiff argues a § 1983 conspiracy occurred when the Defendants unconstitutionally denied him fair access to the courts.  He points to the disappearance of the surveillance-camera evidence and the failure to act on, reveal, or preserve the anonymous letter.  (*Id.*)  In the Sixth Circuit, this type of claim is limited to actions taken before the case was filed.  *Swekel v. City of River Rouge*, 119 F.3d 1259, 1263 (6th Cir. 1997) ("When the abuse transpires post-filing, the aggrieved party is already in court and that court usually can address the abuse.") (citing *Foster v. City of Lake Jackson*, 28 F.3d 425, 430 (5th Cir. 1993) (holding that the right of access to the courts does not include "the right to proceed free of discovery abuses after filing")).  Here, the anonymous letter was received, and allegedly mishandled, after the present litigation was filed. (Cannon Dep., ECF No. 98-2, at 21 (indicating addressee became aware of letter "sometime after the

-26-

filing of this litigation").) Summary judgment is therefore appropriate on the claim that Defendants impaired Plaintiff's access to the courts by responding inappropriately to the letter.

As to the videotape, this court has previously determined that Plaintiff's case was not prejudiced by its disappearance. (Order Denying Pl.'s Mot. for Sanctions, ECF No. 84 at 4.) It follows that Plaintiff's access to the courts was not impaired by the mishandling of the videotape and that summary judgment on this claim in favor of Defendants is appropriate.

### 2. Conspiracy Pursuant to § 1985

To succeed on a claim under § 1985, Plaintiff must prove that there was "some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." *Kush v. Rutledge*, 460 U.S. 719, 726 (1983) (quoting *Griffin v. Breckenridge,* 403 U.S. 88,102 (1971)).

Mastnardo argues that Plaintiff has not presented any evidence of racial or class-based animus. (Def. Mastnardo's Br. in Supp. of Summ. J., ECF No. 47-1 at 23.) Again, the Individual Defendants incorporate Mastnardo's arguments as their own.

Plaintiff argues that summary judgment should not be granted in Defendants' favor on Plaintiff's claim pursuant to § 1985(2) because "Mr. Irvin is an African-[A]merican male that was the victim of a conspiracy perpetrated by all white defendants. The racial discrimination that he has suffered is significant and continuing. This racial discrimination is the animus behind the defendants' action." (Pl.'s Opp. to City's Mot. for Summ. J., ECF No. 98 at 25.) In support of Plaintiff's conspiracy claim pursuant to § 1985(3), Plaintiff argues that Defendant impaired his access to the courts. Plaintiff admits that he must show that the conspiracy was motivated by racial or class-based animus.

-27-

Therefore, other than pointing out that Plaintiff is African-American and the Individual Defendants are white, he provides no evidence in support of his claim. Vague allegations are not enough to state a valid claim for conspiracy to deny civil rights. In the Sixth Circuit, "it is well-settled that conspiracy claims must be pled with some degree of specificity." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987) (citing *Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir.1984)). Thus, summary judgment is granted on the § 1985 conspiracy claim.

### F. Assault and Battery

Plaintiff brings state tort actions against Mastnardo and the Individual Defendants for assault and battery and intentional infliction of emotional distress. (Compl., ECF No. 1 at ¶¶ 60-61.) Individual Defendants have moved for summary judgment pursuant to the Ohio Political Subdivision Tort Liability Act, Ohio Rev. Code § 2744.01, *et seq.* (Individual Officers' Br. in Supp. of Summ. J., ECF No. 48-1 at 15; Def. Mastnardo's Br. in Supp. of Summ. J, ECF No. 47-1 at 24.) This statute immunizes municipal employees from damages actions arising from their official duties, unless they acted outside the scope of their official responsibilities; behaved maliciously, in bad faith, wantonly, or recklessly; or are subject to liability by statute. Ohio Rev. Code § 2744.03(A)(6). Plaintiff argues that a reasonable jury could find that they acted recklessly. (Pl.'s Opp. to Mastnardo Mot., ECF No. 97 at 40-41; Pl.'s Opp. to Officers' Motion, ECF No. 99 at 10-11.)

In Ohio, whether an officer's actions were reckless, wanton, or malicious is usually a question for the finder of fact. *See, e.g.*, *Fabrey v. McDonald Village Police Dep't*, 639 N.E.2d 31, 35 (Ohio 1994) (citing *Matkovich v. Penn Cent. Transp. Co.*, 431 N.E.2d 652, 655 (Ohio 1982)). The standard is a high one. *Fabrey*, 639 N.E.2d at 36 (requiring that "the actor must be conscious that his conduct will in all probability result in injury"); *see also Roszman v. Sammett*, 269 N.E.2d 420, 423 (Ohio

1971) (requiring that "the evidence establish[] a disposition to perversity on the part of the tortfeasor").

Viewed in the light most favorable to Plaintiff, the evidence in this case does not rule out possible findings of recklessness. If Mastnardo knew his initial shove to Irvin's chest was likely to lead to the police dog attacking Irvin, a reasonable jury might find that the contact constituted a battery that was wanton or reckless. And, if Plaintiff was, as he has claimed, mostly passive under unrelenting beating and kicking by the Individual Officers, the jury could find their actions to be reckless assault and battery as well. Summary judgment is therefore denied on the state-law claims of assault and battery against Sgt. Mastnardo and the other Individual Officers.

### G.  Intentional Infliction of Emotional Distress

In addition to invoking political subdivision immunity on Plaintiff's Claim for Intentional Infliction of Emotional Distress, Mastnardo and the other Individual Defendants also argue that Plaintiff has not made out a *prima facie* case for intentional infliction of emotional distress. (D. Mastnardo Reply, ECF No. 102 at 12-14.) In Ohio, the tort requires

> (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community," (3) that the actor's actions were the proximate cause of plaintiff's psychic injury, and (4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it."

*Roelen v. Akron Beacon Journal*, 199 F. Supp.2d 685, 696 (N.D. Ohio 2002) (quoting *Pyle v. Pyle*, 463 N.E.2d 98, 103 (Ohio App. 1983)). The third element of this tort requires a significant showing with regard to emotional injury:

-29-

> Ohio Courts often seek some evidence of medical treatment; expert medical testimony, however, . . . is not necessarily indispensable. . . . In the absence of such expert testimony, however, the Plaintiff must present some evidence in the record beyond mere allegations suggesting a serious and debilitating emotional injury to serve as a guarantee of genuineness in order to survive a motion for summary judgment.

*Barnes v. City of Toledo*, No. 3:08-CV-02090, 2010 WL 1268044, at *11 (N.D. Ohio Jan. 15, 2010) (citing *Burr v. Burns*, 439 F. Supp. 2d 779, 791 (S.D. Ohio 2006)).  Here, Plaintiff has presented no medical evidence and no supporting testimony from other people that he has suffered psychic injury.  Consequently, summary judgment is appropriate on this claim.

### H.  City Defendants

Plaintiff has brought suit against the city of Shaker Heights and against the Mayor, the Chief of Police, and the Assistant Chief.  (Compl., ECF No.1 at ¶¶ 1, 3-4.)  Since he is expressly suing the three individuals in their official capacities (*Id.*), his claims against them are redundant.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity") (citing *Brandon v. Holt*, 469 U.S. 464, 471-472 (1985)).  In the interest of efficiency and clarity, therefore, the court dismisses all claims against Mayor Judy Rawson, former Chief of Police Walter A. Ugrinic, and Chief (formerly Assistant Chief) of Police Scott Lee, since they are in truth claims against Shaker Heights itself.

### 1.  State-Law Claims

Plaintiff is not clear in his Complaint whether he is bringing the claims of assault, battery, and intentional infliction of emotional distress against the City in this case.  Possibly as a result of this, the City does not make an argument in its Motion for Summary Judgment for immunity on state-law claims.  Plaintiff argues in his Opposition Brief that the City's conduct is not immune from

liability because its acts or omissions were undertaken "maliciously, in bad bath, or in a wanton or reckless manner."  (Pl.'s Opp. to City's Mot. for Summ. J., ECF No. 98 at 26.)  In the City's Reply Brief, it argues that it is entitled to immunity pursuant to Ohio Revised Code § 2744.  Ohio Revised Code § 2744.02(A)(1) states that, "[a] political subdivision is not liable in damages in a civil action for injury . . . allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."  Municipalities are also immune from intentional-tort claims, such as assault, battery, and intentional infliction of emotional distress.  *See Wilson v. Stark Cty. Dept. of Human Servs.*, 639 N.E.2d 105, 107 (1994); *see also Walsh v. Vill. of Mayfield*, No. 92309, 2009 WL 1423921, at *2 (Ohio Ct. App. May 21, 2009) (holding that a political subdivision is immune from claims of malicious prosecution and intentional infliction of emotional distress because they are intentional torts).  Summary judgment is therefore appropriate on all state-law claims.

### 2.  Constitutional Claims

Under §1983, a municipality cannot be held liable for the actions of its employees under a theory of *respondeat superior.  Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Instead, a city could be liable for the action of its employees if they resulted from official city action, such that the injury was inflicted by the execution of the city's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).  If such a policy or custom was not the "moving force" of Plaintiff's harm, however, the city has no liability.  *Monell*, 436 U.S. at 694.

The Supreme Court stated that a proper analysis of municipal liability under §1983 requires the evaluation of two distinct issues: (1) whether a constitutional violation occurred; and (2) if such

a violation occurred, whether the municipality was responsible for that violation. *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).  Determining whether the municipality bears responsibility for a constitutional violation requires proof by the injured party of a "direct causal link between municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  To establish such a link plaintiff must "identify the policy, connect the policy to the city itself, and show that the particular injury was incurred because of the execution of that policy."  *Coogan v. Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)(abrogated on other grounds).  A municipality may also be held liable under §1983 if a violation of the plaintiff's constitutional rights was the result of a failure to train officers of the municipality. *Canton*, 489 U.S. at 388.  Failure to train can be the basis for §1983 liability only when this failure "amounts to deliberate indifference to the rights of persons with whom police come into contact." *Id.*

As the court has already determined that Plaintiff cannot prevail on his claims for denial of medical treatment and conspiracy against any of the Individual Defendants, Plaintiff's claims that the City is responsible for denial of access to medical treatment and conspiracy fail as a matter of law.

### a. Alleged Policy on Excessive Force and Canine Officers

Plaintiff alleges that Shaker Heights failed to train its officers adequately in the use of police dogs and the conduct of investigative stops or that the City had a policy in place that permitted misuse of police dogs and the use of excessive force.  (Compl., ECF No. 1 at  ¶¶ 91-92.)

Further Plaintiff has no claim for failure to investigate because, as Defendants argue, "[o]ther than the plaintiff himself, there is no evidence of any other persons who may have been the victims of similar constitutional violations pursuant to the policies or customs of Shaker Heights."  (Def.

-32-

City's Br. in Supp. of Summ. J., ECF No. 50-1 at 13.) Plaintiff does not provide any evidence in his Opposition Brief of other persons who were arguably harmed by an alleged policy of failure to investigate.  Indeed, Irvin did not turn in the form that he was given which may have led to an internal investigation of his complaint because he believed a self-conducted investigation by the police would be a sham.  (Irvin Dep., ECF No. 99-2 at 181-82.)  As a result, Plaintiff cannot prevail on his claim.

The Plaintiff also cannot prevail on a failure to train claim.  Defendants correctly argue Plaintiff has offered no testimony from an expert or any other probative evidence to support his argument that the City had a policy of failure to train its officers.  Further he has pointed to no affirmative policy of the City regulating the use of force or police dogs that violated his constitutional rights.

The Court's statement in *Thomas v. City of Chattanooga*, 398 F.3d 426, 432-433 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 694 and *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997)), is applicable here,

> [t] he danger in appellants' argument is that they are attempting to infer a municipalwide policy based solely on one instance of potential misconduct. This argument, taken to its logical end, would result in the collapsing of the municipal liability standard into a simple respondeat superior standard. This path to municipal liability has been forbidden by the Supreme Court.

The court therefore grants summary judgment in favor of the City on this claim.

### b.  Unconstitutional Policy on Anonymous Complaints against Police

Irvin maintains, without citing case law, that the city has an unconstitutional policy of not investigating anonymous letters of complaint and that this policy played a part in hampering his efforts to obtain redress for his injury through this action.  (Pl.'s Opp. to City's Mot., ECF No. 98

-33-

at 12-13.)  As the court has found, the anonymous letter, and the videotape to which it referred, were not probative to this action, Plaintiff has not shown he was injured by such an alleged policy.  He therefore lacks the standing to raise this question and summary judgment is granted.

### I.  Punitive Damages

Punitive damages can be awarded in § 1983 cases only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Defendants have moved for summary judgment on the ground that no such motive or reckless indifference could be found by a reasonable jury.  (Def. Mastnardo's Br. in Supp. of Summ. J., ECF No. 47-1 at 25; Individual Officers' Br. in Supp. of Summ. J., ECF No. 48 at 19-20; Def. City Mot., ECF No. 50 at 26-27.)  As discussed above in Section III(F), the court cannot rule out such a finding as a matter of law; therefore, the motion for summary judgment is denied.

### IV.  CONCLUSION

City Defendant's Motion for Summary Judgment on all counts is well-taken and is granted in full.  (ECF No. 50.)  Defendant Mastnardo's Motion for Summary Judgment is granted in part and denied in part.  (ECF No. 47.)  The claims remaining against Mastnardo are: unreasonable seizure, excessive force, and the state-law assault and battery.  The Individual Officers' Motion for Summary Judgment is granted in part and denied in part.  (ECF No. 48.)  The claims remaining against the Individual Officers are: excessive force and state-law assault and battery.

IT IS SO ORDERED.

/S/ SOLOMON OLIVER, JR.
CHIEF JUDGE
UNITED STATES DISTRICT COURT

August 18, 2011